Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Zlatina T. Meier (SBN 310875) *im@mckennonlawgroup.com*
**McKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-387-9595 | Fax: 949-385-5165

Attorneys for Plaintiff Edward Talley

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| EDWARD TALLEY,<br><br>                    Plaintiff,<br><br>vs.<br><br>PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br> -  Civil Cover Sheet.<br> -  Summons; and<br> -  Certification of Interested Parties] |

## JURISDICTION AND VENUE

1.      Plaintiff, Edward Talley, ("Plaintiff" or "Mr. Talley") brings this action to recover benefits and to enforce and clarify his rights under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. section 1132(a)(1)(B).   This Court has subject matter jurisdiction over Plaintiff's claim pursuant to ERISA section 502(e) and (f), 29 U.S.C. section 1132(e) and (f), and 28 U.S.C. section 1331.

2.      Venue lies in the Central District of California, Southern Division pursuant to ERISA section 502(e)(2), 29 U.S.C. section 1132(e)(2), because Plaintiff resides in this District, some of the breaches alleged occurred in this District and the ERISA-governed plan at issue was administered in part in this District.  Venue is also proper pursuant to 28 U.S.C. Section 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred within this district; namely, Defendant, Provident Life and Accident Insurance Company Group ("Provident"), denied Plaintiff's claim within the district.

## THE PARTIES

3.      Plaintiff, Mr. Talley, is an individual who, at all times relevant to this action, was a citizen of the state of California and a resident of Orange County, California, City of Aliso Viejo.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA section 3(7), 29 U.S.C. section 1002(7), in an employee welfare benefit plan, pursuant to the Defendant's Individual Disability Income Policy (the "Plan"), which is at issue in this action.

Case No.:

4.    Defendant Provident Life and Accident Insurance Company, ("Provident") is, and at all times relevant was, a Tennessee corporation with its principal place of business located in Tennessee.  Provident administered long-term disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing individual policy number 06-675-4969089 (the "Policy") to Plaintiff, through and with the assistance of his employer, Johnson Controls Inc. ("Johnson").  That Policy and the Plan promised to pay LTD benefits to Plaintiff should he become disabled.  The Policy expressly provides that it "provides benefits under a Plan which is subject to the Employee Retirement Income Security Act of 1974 (ERISA)."

5.    The true names and capacities, whether individual, corporate, associate or otherwise of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sue DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained; DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment.  Plaintiff is informed and believes and thereupon alleges that each of DOES 1 through 10 is legally responsible in some manner for the events referred to herein, and directly and proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

**FACTUAL BACKGROUND**

6.    Mr. Talley started working at Johnson on August 1, 2018, in the position of Project Team Leader-Mechanical I, II.  According to his employer's official position description, dated July 2013, prepared by Mike Hannigan, a VP operations support specialist at Johnson, Mr. Talley was responsible for a wide variety of duties.



Mr. Talley oversaw the overall execution and performance of mechanical retrofit projects. Mr. Talley ensured that project management standardized procedures and processes were followed to achieve financial results on assigned projects consistent with Johnson's standard practices. Mr. Talley provided project coordination for the day-to-day activities of his team members and subcontractors and reviewed mechanical project estimates. Mr. Talley directed the process of securing new work and executed change orders for existing customers. Mr. Talley managed collection, cost control, progress billings and payables for his team projects. Mr. Talley acted as a technical resource for the sales personnel. Mr. Talley assisted with any compliance issues for the overall project safety program by assuring the adherence to safety standards. Mr. Talley was responsible for financial and project management, scheduling, budgeting, billing, and procuring material, warehousing, and logistics processes. Mr. Talley coordinated the drawing layouts/detailing for proper job installation and analyzed financial reporting systems and project schedules to proactively address potential problems and manage risk. Mr. Talley provided high quality written communications to ensure project document controls were in compliance with contract requirements and developed and maintained viable long-term relations with customers and subcontractors. Mr. Talley managed projects that included large equipment-type installations for heating and air conditioning for larger buildings of all types like offices, schools, hospitals, and airports. Mr. Talley also assessed hazards and provided solutions in case of client's emergencies of equipment malfunctions. Mr. Talley used negotiations skills that resolved disputes and coordinated the expectations of the customers from the projects.

7.    The position requires the ability to sit for extended periods of time with some standing, stooping, walking, stretching, reaching, lifting, and performing moderate range-of-body motions. Mr. Talley is required to sit for at least 6 hours daily and engage in prolonged use of a computer to complete his job assignments.

Case No.:



The position also necessitates the ability to regularly lift a minimum of 10 pounds, and occasionally lift over 20 pounds. The position includes driving to construction sites and evaluating issues with the installation equipment that involved crawling, crouching, and moving objects to access the areas where the units were installed. In addition to light physical activity, Mr. Talley's position requires him to exercise a significant degree of mental skills to quickly evaluate the financial and compliance tasks for every project that was assigned to his team. Mr. Talley's mental focus and good memory are essential for the successful scheduling, financial evaluation of the necessary costs, and execution sequences of each of the team tasks. Mr. Talley's ability to analyze, design and execute problem solving strategies is an essential element of his daily tasks as a project team leader to ensure continued customers' satisfaction.

**The Relevant Terms of the Policy**

8.    The Policy covered Mr. Talley during his employment with Johnson. Under the terms of the Policy, Mr. Talley is entitled to $1,957.00 per month in Total Long-Term Disability benefits, which is not subject to adjustment to account for other benefits received and is payable until the date when he reaches age sixty-five (65), the end of the Maximum Benefit Period defined in the Policy.

9.    The Policy states in pertinent part that:

**Total Disability** or **Totally Disabled,** during the Usual Occupation period shown in the Policy Schedule, means that as a result of Sickness or Injury:

1.  You are not able to perform with reasonable continuity the Substantial and Material Acts necessary to perform Your Usual Occupation in the usual and customary way; and
2.  You choose not to work at any occupation.

**Sickness** means an illness or disease.

Case No.:

**Benefits for Total Disability**

If You are Totally Disabled, we will pay benefits as follows:

1. Benefits start to accrue on the first day of Total Disability following the Elimination Period shown in the Policy Schedule. The Elimination Period may be satisfied by days of Total or Partial Disability.

2. The Maximum Monthly Benefit Amount will be paid for as long as Total Disability continues, but not beyond the Maximum Benefit Period for Disability.

10.     Pursuant to the terms and conditions of the Policy, Mr. Talley is entitled to LTD benefits because he met, and continues to meet, the Policy's operative definition of "disability" and the other conditions necessary to qualify for LTD benefits during the relevant time-period.  As a result of sickness, Mr. Talley is not able to perform with reasonable continuity the Substantial and Material Acts necessary to perform his Usual Occupation in the usual and customary way.

11.     Mr. Talley suffers from irreversible cervical degenerative disc disorder and neurocognitive disorder.  Both of Mr. Talley's medical conditions prevent him from executing the tasks of scheduling, reviewing, calculating, and formulating the assignments for his team daily, in his capacity as a Project Team Leader.  Mr. Talley's functional limitations and restrictions prevent him from rotating his neck, sitting in a fixed position, walking, or driving for extended periods of time.  Mr. Talley has difficulty with finding words and expressing himself that hinders his communications with other team members, subcontractors, and customers.  Mr. Talley's memory issues prevent him from executing the bare minimum of his job duties that require highly skilled evaluation of complicated project schedules, work change orders, and daily job assignments to his team members.  Mr. Talley has lost the ability to communicate technical information to a non-technical audience and is unable to consistently use project management software and financial accounting systems to create and oversee project assignments.  Mr. Talley's limitations in speech and



language impede his job duties of handling customers' complaints and designing solutions for any unforeseeable problems with the product that require swift decisions. Mr. Talley's constant neck and back pain, coupled with the limitation of movement of his neck, prevented him from sitting for prolonged time in front of a computer, driving, and visiting construction sites. Mr. Talley's excessive sleepiness and frequent migraines interfere with his daily job duties requiring constant supervision of his team members and managing any unforeseeable malfunctions with the units. Mr. Talley's tingling and numbness in his extremities prevent him from lifting, crawling, crouching, and performing the physical components of his job duties at construction sites.

12.    The Policy allows Provident to require Mr. Talley to submit to an independent medical examination ("IME") by a physician. It states: "We, at Our own expense, shall have the right and opportunity to examine You when and as often as We may reasonably require during the pendency of a claim hereunder."

13.    Pursuant to the terms and conditions of the Policy, Mr. Talley's benefits are subject to a limitation for Mental Disorder disability. The provision states that Benefits for Mental Disorders will be payable for the maximum benefit period for mental disorders of twenty-four (24) months, not to exceed the maximum benefit period for disability. The limitation provision provides the following:

**LIMITATIONS FOR DISABILITY RESULTING FROM A MENTAL DISORDER**

Mental disorders mean any mental or emotional disorder or functional nervous disorder (except dementia resulting from stroke, trauma, infections, or degenerative diseases such as Alzheimer's disease). To make a determination we may consult the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a Disability. Such



disorders include but are not limited to, psychotic, emotional or behavioral disorders. If the DSM is discontinued or replaced, We may consult the diagnostic manual then in use by the American Psychiatric Association as of the start of a Disability.

14.    Mr. Talley's initial application for long-term disability benefit payments was approved on December 4, 2019. Provident paid Mr. Talley a monthly benefit amount of $1,957 until Provident discontinued the payments in January 2022. Provident claimed that pursuant to the Mental Disorder Limitation in the Policy, Mr. Talley was not eligible for disability benefits exceeding twenty-four (24) months, because his medical condition, giving rise to the disability, was related to a behavioral mental disorder.

15.    However, Provident 's decision to discontinue Mr. Talley's disability payments was incorrect and based on erroneous reading and interpretation of Mr. Talley's medical records by Provident 's biased, in-house physicians, and vocational expert.  In a hasty and incomplete review of Mr. Talley's claim file, Provident provided an implausible denial of benefits Letter, not supported by the recommendations of any medical professionals that examined Mr. Talley personally. Provident did not elect to conduct its own Independent Medical Examination and relied solely on "peer review" opinions of its internal medicine physician and a paid neurologist, who never took the time to personally examine Mr. Talley.

16.    As a result of Provident 's sloppy investigation of Mr. Talley's large medical file that included voluminous medical records of PET brain scans, brain and spine MRI's, CT scans, Neuropsychological Evaluations, Medical Procedures, records of speech therapy sessions, records of physical therapy sessions, and other medical tests, Provident reached the improper decision to discontinue Mr. Talley's disability benefits under the Mental Disorder limitation provision of the Policy.

Case No.:



17. Despite having straightforward evidence supporting Mr. Talley's physical disability, due to permanent, non-reversible cervical degenerative disease, and a neurocognitive disorder with non-behavioral etiology, and without any statements from Mr. Talley's treating physicians that he was able to return to work, Provident informed Mr. Talley that it would stop paying his benefits. Additionally, Provident failed to give the proper weight to the conclusions, stated in the November 3, 2020, Decision of the Social Security Administrative Law Judge, who determined that Mr. Talley was disabled due to the impairments of neurocognitive disorder, depression, and cervical degenerative disc disorder, and awarded him Social Security Disability Income ("SSDI"). Mr. Talley is entitled to long-term benefits because he presently continues to experience both physical and cognitive restrictions and limitations to his ability to work.

18. Mr. Talley's second insurance company, Lincoln Financial Group ("Lincoln"), conducted a review of Mr. Talley's medical file, pursuant to his application for long-term disability benefits, and reached the opposite conclusion of Provident, that Mr. Talley was eligible to receive long-term disability benefits. Since August 27, 2019, Mr. Talley has been receiving and continues to receive to date long-term disability payments from Lincoln. Mr. Talley's Lincoln policy also contained a "Mental Disorder" limitation similar to Provident 's Mental Disorder Limitation stated above. However, Lincoln **did not stop Mr. Talley's long-term disability payments after twenty-four (24) months based on that limitation**, because Lincoln correctly evaluated and reviewed Mr. Talley's medical records to reach the correct conclusion that Mr. Talley is eligible for benefits based on the overwhelming presence of physical restrictions and limitations that prevent Mr. Talley from returning to work.

Case No.:

**Mr. Talley's Medical History and Disability.**

19.    On February 12, 2019, Mr. Talley did not report to work due to the fact that he experienced severe symptoms of his medical conditions that rendered him incapable of working in his Usual Occupation as a Project Team Lead, either with or without accommodations, as well as from any other occupation for which he is qualified for or may reasonably become qualified for based on education, training or experience. Mr. Talley's last day of work was February 11, 2019.

20.    According to Mr. Talley's testimony, at his Social Security Administration's case hearing, he was not able to return to work due to neck pain preventing him from turning his head and due to severe cognitive functional limitations, which affected his memory and verbal ability to communicate with his coworkers. At the time Mr. Talley became disabled, he experienced the following symptoms that significantly impaired his ability to perform his job: memory loss, brain dysfunction, headaches, numbness/tingling in the fingers of his hands, depression, mental fog, excessive sleepiness, difficulty in concentration, symptoms of Alzheimer's related dementia like difficulty with driving, grocery shopping, and other functional brain related tasks. Mr. Talley had a challenging time executing simple tasks like making plans, lists, managing finances, and other computer-related tasks. Mr. Talley also experienced limb pain, neck pain, weakness, fatigue, and general mental and physical discomfort. Mr. Talley could not communicate with people properly due to limitations in his speech and finding the words to express himself that led to severe depression.

21.    Mr. Talley's primary physician, Paul Cassidy, M.D., an internal medicine physician, referred him for evaluation and treatment to Dr. Lynda G. Heffend, Ph. D., a clinical psychologist, and Dr. Joey Gee, M.D., a neuropsychologist.

Case No.:



Mr. Talley required a team of physicians to ensure ongoing treatment and medical care. Since 2018, Mr. Talley received extensive medical care from Dr. Gee, even before his onset of disability on February 12, 2019. Dr. Gee treated Mr. Talley with medications, referred him to physical and psychiatric therapy and ordered many PET Bran scans, evaluations, and other medical tests to evaluate Mr. Talley's myriad of disabling symptoms.

22.    As part of his ongoing treatment of Mr. Talley, on April 6, 2020, Dr. Gee provided a certification letter to Provident that stated that: "For medical reasons, Mr. Talley will be placed on medical disability due to the severity of the cognitive loss and depressive symptoms, he is unable to work at this time."

23.    A second neurologist that agreed with Dr. Gee's assessment of Mr. Talley's neurocognitive disorder, was a specialist and expert in the neurology field, Dr. S. Ahmad Sajjadi, Assistant Professor of Neurology at the UCI Department of Neurology, who specializes in the treatment of memory disorders and behavioral and cognitive neurology. During his March 30, 2020, examination, Dr. Sajjadi summarized his evaluation of Mr. Talley and opined that his problems had a neuro-degenerative etiology, and not behavioral-related Mental Disorder. Dr. Sajjadi stated the following in his exam notes:

> 59-year-old gentleman with around 1 year history of onset of significant apathy and inability to concentrate. He has no past medical history of psychiatric issues. He has a long history of excessive alcohol intake. Previous investigations include an FOG PET scan in April 2019 that had shown a pattern of hypo metabolism in keeping with Alzheimer's disease. He also had a neuropsychological assessment a year ago that did not show any significant cognitive impairment. He follows with a psychiatrist colleague and is on a cocktail of psychiatric medications. We spent some time discussing the etiology of his perceived problems. **I agreed that neuro-degenerative etiology was the most likely**. The



differentials include Alzheimer's disease versus frontotemporal dementia. The findings of FOG PET scan point towards Alzheimer's disease as the more likely explanation. (Emphasis added).

24.     Since February 12, 2019, Mr. Talley underwent multiple medical tests, scans, procedures, and medical evaluations by multiple physicians, that clearly indicated that Mr. Talley's disabling symptoms were consistent with a cervical degenerative disc disease and a mental neurocognitive disorder with symptoms of dementia type disease like Alzheimer's disease.  Pursuant to the Policy terms, both medical conditions rendered Mr. Talley independently eligible for long-term disability benefits, not subject to the Mental Disorder limitation.

25.     The medical records support Mr. Talley's treating physicians' conclusions that in addition to his significant cognitive impairments, related to some form of degenerative disease of the brain that impaired Mr. Talley's ability to concentrate and complete the mentally related aspects of his job, Mr. Talley's symptoms of pain, sleepiness, and limb restrictions were related to a cervical degenerative disc disorder that placed significant physical restrictions and limitations on his ability to work.

26.     On December 2, 2018, several months before his onset of disability on February 12, 2019, Mr. Talley underwent a Cervical Spine MRI, ordered by Dr. Gee. The MRI results listed the following impressions: "1) mild to moderate degenerative disc disease without acute cervical fracture or loss of vertebral body height, anatomic vertebral body alignment; 2) multilevel disc osteophyte complexes most notably at the C3-4 and C4-5 levels, thecal sac encroachment was notes without cord effacement, and associated foraminal stenosis bilaterally."  The MRI's findings were consistent with Mr. Talley's symptoms, that he reported at his medical exam on December 5, 2018, of headaches lasting more than six (6) weeks, neck tension, and

Case No.:



nocturnal teeth clenching. Mr. Talley was referred to physical therapy and treated with medications.

27.   On February 21, 2019, nine (9) days after Mr. Talley's last day of work, he was seen at the Mission Medical Center for treatment of "generalized anxiety disorder," "major depressive disorder, single episode, severe without psychotic features," and was assigned a treatment plan for eight (8) weeks of psychiatric therapy.   He attended therapy sessions and was treated with the medications: Trazodone, Caduet, Omeprazole, Wellbutrin, and Adderall.   During his follow-up appointment with Dr. Kimberly Shapiro, on April 5, 2019, Mr. Talley was still experiencing the symptoms of depression and memory impairments, and was ordered to continue with his therapy sessions, but with increased dose of the medication Wellbutrin.   Mr. Talley received the diagnosis of "generalized anxiety disorder" as primary, and additional diagnosis of "major depressive disorder, single episode, severe without psychotic features."

28.   On March 14, 2019, Mr. Talley was examined by Dr. Kathleen Furlong, N.P., at St. Joseph Health's medical office for follow up on his mental rehab with the Laguna Beach Mental Health outpatient program with concerns for "dementia," due to the fact that Mr. Talley complained of "not being able to function mentally", and that he received no relief from long term ADHD medications.   Dr. Furlong diagnosed Mr. Talley with complicated symptoms with major depression and GAD with chronic underlying ADHD and ordered a Brain PET to assess the neurochemical function, referred Mr. Talley to Neuro Psyche Cognitive assessment and counseled him and his wife regarding causes of memory loss, types of dementia, brain, and cognitive health.

29.   On March 26, 2019, Mr. Talley underwent a Neuropsychological Evaluation by Dr. John Bellone, Ph. D., a neuropsychologist, who evaluated Mr.



Talley's diagnoses of "cognitive complaints, major depression, generalized anxiety disorder, and ADD." Despite Mr. Talley's complaints of acute anhedonia and apathy, depression, memory problems, and generalized anxiety disorder, after Mr. Talley's neurocognitive testing was unremarkable, Dr. Bellone concluded that Mr. Talley's cognitive domains were within normal limits and indicated that his symptoms of anhedonia and apathy were psychiatric as opposed to neurocognitive in nature. However, Dr. Bellone could not rule out that the complaints were related to a degenerative brain disease and recommended neuroimaging and repeat evaluation in a year.

30.   On April 3, 2019, Mr. Talley's brain PET metabolic evaluation impression Scan included the following finding: **"Decreased FDG activity in the anterior temporal lobes and superior parietal lobes consistent with Alzheimer's disease."** This abnormal PET scan, that was performed significantly close to Mr. Talley's last day of work on February 11, 2019, was referred to and evaluated in Mr. Talley's subsequent medical visits with multiple physicians, and was the first indication that Mr. Talley's cognitive issues with memory and depression were directly related to a form of neurocognitive disorder and/or a degenerative brain disease, as opposed to a product of Mr. Talley's temporary behavioral mental condition of a psychiatric nature.

31.   On April 15, 2019, after physical examination and review of the April 3, 2019, abnormal PET scan, Dr. Gee noted that "Neuropsychology assessment was normal, but PET brain scan did show minor changes that may be seen in Alzheimer's. Clinically he does not have AD, and no treatment was needed other than behavioral and lifestyle changes." Dr. Gee referred Mr. Talley to speech and language Therapy Evaluation and Treatment for cognitive care.

32.    On April 19, 2019, after Mr. Talley's progress visit with Dr. Shapiro, M.D., she indicated in her assessment plan that:

> "Patient presenting with some improvements with change in medication, however persistent depression, lack of emotion and finding no joy in life. Patient does feel like he wants to get better but is not very hopeful. Not an acute risk for self-harm. However, patient would benefit from continued participation in the IOP level of care, continues to meet medical necessity due to level of depression."

33.    On April 24, 2019, Mr. Talley underwent speech therapy evaluation with Dr. Kenneth Rexinger, who noted in his summary that: "Patient presents with mild cognitive impairments along with ADD and depression. Patient would benefit from education, strategies, and cognitive activities to enhance function," and recommended speech/language pathology treatment services for eight (8) weeks.

34.    On April 30, 2019, Mr. Talley underwent cognitive linguistic speech therapy treatment at the Mission Medical Center for his cognitive impairments, specifically to improve his word fining, attention, memory, verbal reasoning with the goal to improve his cognitive communications skills to enable successful completion of his daily cognitive activities. On July 12, 2019, in a speech therapy treatment note, it was noted that Mr. Talley had mild cognitive impairment, other specified depressive episodes, and ADHD. Mr. Talley was treated with the medications of Wellbutrin, Lexapro, and Trazodone. When Mr. Talley was discharged from his speech/pathology treatment on July 26, 2019, it was noted by Janice L. Cooper, M.A., that his medical diagnoses were the following: "mild cognitive impairment, other specified depressive episodes, and attention-deficit hyperactivity disorders."

35.    On September 16, 2019, during a progress report visit, Dr. Gee noted that Mr. Talley continued to experience problems with executive functioning,

-14-

Case No.:



1    depression and that he was attending a speech and language therapy and treating with

2    the medication Modafinil.  Dr. Gee diagnosed him with cognitive impairment and

3    executive function deficit.

4

5          36.    On October 28, 2019, Dr. Lynda Heffend, Ph. D., a clinical psychologist

6    provided an Attending Physician Statement indicating that it was impossible to

7    determine if Mr. Talley would ever experience an improvement in his functional

8    abilities due to the fact that Mr. Talley was experiencing the following symptoms and

9    limitations: 1) "difficulty communicating with others"; 2) "unable to follow simple

10   instructions"; 3) "severely depressed"; 4) "easily fatigued, need of at least two naps

11   per day"; 5) "severe cognitive impairment"; 6) "anhedonia, severe problems

12   completing tasks that used to be easy to him"; 7) "client receiving individual

13   psychotherapy."

14

15        37.    On January 6, 2020, in a follow-up for his depressive mood and cognitive

16   complaints, Mr. Talley showed no improvement in his condition.  He continued to

17   experience lack of emotions, poor motivation, difficulty with noise and crowds and

18   lacked joy in things he used to enjoy like golfing.  The assessment was major

19   depression, cognitive dysfunction acquired, degenerative brain disorder, and

20   abnormal PET scan of the prior test on April 3, 2019.

21

22        38.    On January 7, 2020, Dr. Gee completed an Attending Physician

23   Statement Form, pursuant to Provident 's request, and stated that Mr. Talley continued

24   to receive ongoing medication treatment and cognitive care for his cognitive

25   impairment diagnosis and that Mr. Talley experienced the symptoms of poor memory

26   and periodic limb movements of sleep.  Dr. Gee also indicated that there was no

27   change in diagnosis and that Mr. Talley had an abnormal neuropsychological

28   assessment and PET scan of the brain.  Dr. Gee listed depression as a secondary



diagnosis and indicated that Mr. Talley was limited to no driving or limited driving and had poor work ability due to cognitive loss.

39.    On February 22, 2020, Mr. Talley attended a consultive psychological evaluation with Rosa Colonna, PH.D., a clinical psychologist, who diagnosed him with an unspecified neurocognitive disorder based on the test results and clinical data. Dr. Colonna noted that Mr. Talley presented complaints "similar to early onset of Alzheimer's disease and problems with ongoing cognitive and executive functioning issues and memory." Since Mr. Talley's overall cognitive ability fell within the low average range, Dr. Colonna opined that Mr. Talley had moderate difficulties in the following: "in the ability to understand, remember and carry out detailed instructions; and in the ability to interact appropriately with supervisors, coworkers, and peers."

40.    As other physicians indicated, Dr. Colonna's opinions were consistent with Mr. Talley's prior medical exams and showed that he experienced cognitive impairments for over a year, supporting the conclusion that Mr. Talley's mental condition was not related to a psychiatric diagnosis of mental disorder, and that it was most likely related to the beginning symptoms of some form of a degenerative brain disease.   Both the abnormal brain scans in 2019 and 2020, and the lack of improvement in Mr. Talley's cognitive abilities evidence that Mr. Talley suffered from a degenerative brain disease that falls within a type of dementia, including but not limited to an Alzheimer's disease.

41.    In scholastic articles, experts agree that specific types of dementia are challenging to diagnose. Some of the most common early sign on Alzheimer's disease include: 1) Changes in mood, such as depression or other behavior and personality changes; 2) Confusion with location or passage of time; 3) Difficulty concentrating, planning or problem-solving; 4) Having visual or space difficulties, such as not



understanding distance in driving, getting lost or misplacing items; 5) Language problems, such as word-finding problems or reduced vocabulary in speech or writing; 6) Memory impairment, such as difficulty remembering events; 7) Problems finishing daily tasks at home or at work, such as writing or using eating utensils; 8) Using poor judgment in decisions; 9) Withdrawing from work events or social engagements. [1]

42.    Provident failed to recognize in its medical reviews that no single test, medical exam, MRI or CT scan can diagnose and identify the type of dementia that Mr. Talley has, but instead an overall approach evaluating Mr. Talley's cognitive abilities by his treating physicians should be the best test to be used when diagnosing Mr. Talley's cognitive disorder that qualifies him for receiving disability.

43.    Mr. Talley's overall health symptoms of depression and overall apathy and anhedonia, major depression lasting for over a year, memory impairments, difficulty with concentration, visual and space difficulties, and poor decision making, in light of the medical test evidence of his abnormal PET brain scans in 2019 and 2020, show a pattern deemed compatible with Alzheimer's disease or the beginning symptoms of some form of dementia.

44.    In a subsequent telehealth visit on March 30, 2020, with Dr. Sajjadi, Mr. Talley presented with complaints of continued attention and concentration issues, described as "zoning out" after nearly a year of depression history and treatment at Mission Hospital.    It was noted that Mr. Talley had refrained from alcohol consumption for over a year without much improvement. His wife reported that Mr.

---

1 *See* Natalie Makepeace, *An Introductory Guide to Understanding Dementia, Alzheimer's Disease, Mayo Clinic Health Systems* (Aug. 21, 2024, 9:31 AM), https://www.mayoclinichealthsystem.org/hometown-health/speaking-of-health/understanding-dementia-and-alzheimers-disease.

Case No.:



Talley had lost all expression on his face and had problems with multi-tasking and difficulty navigating when driving.

45.     On April 6, 2020, Mr. Talley presented for a progress exam with Dr. Gee, who noted again that Mr. Talley's symptoms may be related to Alzheimer's disease: "At this time, his past the PET scan of the brain did not suggest frontotemporal dementia there was some slight decreased uptake in the temporal and parietal cortex.  In discussion previously with a neuro radiologist, more suggestive potential Alzheimer's related."  On April 20, 2020, Mr. Talley's brain MRI showed the following findings: "Very few foci of T2/FLAJR increased signal in the frontal and temporal lobes white matter which are nonspecific and may represent small vessel ischemic changes, migraine disease: or less likely demyelinating process."

46.     During the Social Security Administration's evaluation of Mr. Talley's case, the State of California Agency mental consultants, P. Caruso-Radin, Psy. D, and J. Flocks, M.D., reviewed Mr. Talley's medical records.  They opined that Mr. Talley: 1) "had moderate limitations in interact with others and in concentrate persist or maintain pace"; 2) "had mild limitations in understand, remember or apply information; and in adapt or manage oneself"; 3) "he would function better in an environment where he interacts with coworkers, supervisors on a superficial, non-collaborative basis."  Unfortunately, these limitations are not consistent with Mr. Talley's job responsibilities of project team leader who must significantly interact daily with team members and outside work vendors to schedule, execute and oversee projects for his employer that involve significant interpretation of data, numbers, and computation.

47.     On April 27, 2020, Mr. Talley underwent another brain PET metabolic evaluation, which resulted in the following findings: "**When compared to the prior**

-18-

Case No.:



**PET/CT there is similar decreased FDG avidity involving the bilateral superior parietal lobes as well as the anterior temporal lobes**.  There is intracranial vascular calcification.  There is preservation of gray-white differentiation with few scattered subcortical hypodensities."  That PET test confirmed the findings of the prior PET scan from April 3, 2019, which indicated the same "Decreased FDG activity in the anterior temporal lobes and superior parietal lobes consistent with Alzheimer's disease."  The presence of the same abnormality in Mr. Talley's follow-up PET indicated that Mr. Talley indeed suffered from a neurocognitive disorder and his ongoing cognitive loss symptoms were not due to a behavioral/psychiatric mental condition.  Thus, Mr. Talley is not limited by the Mental Disorder Limitation provision in his Policy and should receive long-term disability benefits.

48.    On May 4, 2020, Mr. Talley had a PET CT Brain Metabolic Evaluation, ordered Dr. Gee, to supplement Mr. Talley's prior abnormal PET scan.  The findings section of the CT scan stated the following: "When compared to the prior PET/CT there is similar decreased FDG avidity involving the bilateral superior parietal lobes as well as the anterior temporal lobes.  There is intracranial vascular calcification.  There is preservation of gray-white differentiation with few scattered subcortical hypodensities."

49.    After a referral to speech and language therapy evaluation by Dr. Gee for Mr. Talley's cognitive impairment symptoms, Mr. Talley attended speech and language therapy again at Mission Medical Center on July 6, 2020, and enrolled in therapy for eight (8) weeks to improve his speech, language, voice, communication, and auditory processing disorder.

50.    On July 20, 2020, Mr. Talley presented for his annual physical exam with Dr. Elwyn Rexinger, M.D., and reported the symptoms of fatigue.  Under active

problems, Dr. Rexinger listed the following non-exclusive list of problems: "1. Abnormal PET scan of head (R94.02) • 413/19 PET Brain: Decreased FDG activity anterior temporal lobe and superior parietal lobe; 2. ADD (attention deficit disorder) (F98.8); 3. Anxiety (F41.9); 4. Cervical disc disease (MSD.90) • 12/2/16 MRI C-Spine: Multilevel DDD. Foraminal narrowing. Normal cord.; 5. Cognitive complaints (R41.9) • 12/2018 Brain MRI: unremarkable; 6. Cognitive dysfunction, acquired (F09); 7. Cognitive impairment (R41.89); 8. Degenerative brain disorder (G31.9); 9. Depression, major (F32.9); 10. Executive function deficit (R41.844); 11. Headache (RS1); 13. Migraines headache without aura (G43.009) • 12/2/18 Brain MRI: unremarkable. No enhancement; 12. Tension-type headache (G44.209) • 12/2/18 Brain MRI: unremarkable." As evidenced by his chart, Mr. Talley's disabling medical conditions continued to present limitations and restrictions on his functional capacity to return to work.

51.     On July 21, 2020, Mr. Talley repeated the neuropsychological evaluation with Dr. Bellone, who compared his findings to Mr. Talley's prior evaluation on March 26, 2019.  In a pattern consistent with some form of degenerative brain disease, Dr. Bellone made the following findings: "**Performance declined on nearly all measures compared to 2019, in particular processing speed, executive functioning and learning and memory**."  In summary, Dr. Bellone noted in his evaluation that Mr. Talley reported vague cognitive symptoms such as difficulty performing tasks and occasionally forgetting information, and that objective testing revealed mixed difficulties in learning/memory, executive functioning and processing speed, deficient performance on a word list, and delayed recall of visual information. **Dr. Bellone indicated that Mr. Talley may have atypical symptoms of Alzheimer's disease**.

Case No.:



52. Specifically, Dr. Bellone indicated the following findings, diagnosed Mr. Talley with mild cognitive impairment and ordered repeat testing in one year:

1) Performance declined on nearly all measures compared to 2019, in particular processing speed, executive functioning, and learning and memory.

2) The PET scan of the brain from over a year ago showed "decreased FOG activity in the anterior temporal lobes and superior parietal lobes consistent with Alzheimer's disease" (AD). AD is relatively rare in Mt. Talley's age range (especially with no family history) and does not typically first present with psychiatric symptoms (i.e., anhedonia and apathy). Still, it is possible that he has an atypical AD clinical presentation. The general decline in test performance over the past year does fit with AD, especially since this decline occurs in the context of substantial mental health treatment (medication management, IOP, individual therapy) and reports of improved mood (i.e., this now argues against a psychiatric etiology). That being said, an updated PET scan showed no change in metabolic activity-if AD were present, reduced temporoparietal metabolic activity would have been predicted over the year. To reiterate, it is possible that Mr. Talley has atypical, early-onset AD, but this does not fully fit with the existing data/presentation.

3) It remains possible that symptoms are related to his history of alcohol use, given the extent of his consumption (reportedly the equivalent of~ 10 drinks of liquor several days each week for 20+ years; he quit heavy use in February, 2019, but still has one: drink on rare occasions). Also, he has a diagnosis of ADHD, so it is possible that inattention drives some of his cognitive symptoms and might explain the mixed performance within domains and between time-points. Still, neither alcohol use nor ADHD would fully explain the presentation.

3) In the Memory category – decline on delayed recall for all three measures and decline in delayed recognition for word list, slight decline in the attention category, decline in the processing speed category, slight decline in fluency in the language category, in the visuospatial ability - slight decline in line orientation, decline in the executive functioning category in set shifting, inhibition, and problem solving, decline in the learning category on word list.

53. On July 21, 2020, Mr. Talley continued treatment with the following medications, indicating that he received ongoing care with medications in addition to his regular office visits: 1) Vyvanse 60mg; 2) Trazodone 50mg; 3) Wellbutrin 150mg; 4) Lexapro 10mg; 5) Caduet (due to HLD); and 6) Donepezil. Mr. Talley had regular visits with his psychiatrist once per month and a therapist twice per month.

Case No.:



54.    On August 3, 2020, Mr. Talley presented for a telemedicine visit with the symptoms of exhaustion and excessive sleepiness.  Dr. Gee noted the diagnosis of "cognitive dysfunction, major depression, and malaise and fatigue," and added the medication of Modafinil, which showed that Mr. Talley had a continued need for medical treatment for his neurocognitive disorder.

55.    On September 11, 2020, Dr. John Froh, D.C., Mr. Talley's chiropractor, completed a Residual Functional Questionnaire for Provident  that included the following findings: "1) Mr. Talley's impairment is likely to produce good and bad days; 2) Limitations on lifting heavy objects, with rarely lifting 20 lbs. or more, and capability of only occasional lifting of 10 lbs.; 3) Limitations of sitting less than 2 hours and standing and waling less than 2 hours in an 8-hour working day; 4) Standing limitations of less than 10 minutes; 5) Sitting limitation of less than 10 minutes; 6) Frequent pain in Mr. Talley's Lumbosacral Spine – bilateral level L1-5 paraspinal muscles and joints; 7) Bilateral pain in the Lumbar region; 8) Symptoms of tenderness, pain, muscle spasms and limitation of motion." Mr. Talley was receiving treatment for his increased disability symptoms related to his disc degenerative disease.

56.    On September 21, 2020, during a telemedicine visit with Dr. Gee, Mr. Talley complained of excessive sleepiness and that the medication Modafinil did not elicit any benefits.  Dr. Gee continued to report the following diagnoses in his assessment: cognitive impairment, abnormal PET scan of head (4/3/19 PET Brain: Decreased FDG activity anterior temporal lobe and superior parietal lobe); periodic limb movement disorder (PLMD), sleep disorder, major depression. In his summary, Dr. Gee stated that "His neuropsychological assessment did not suggest AD. He poses risk nonetheless. Trial of gabapentin to aid sleep cycle at night and PLMD."

Case No.:



57.    However, Dr. Gee's summary note from the September 21, 2020, exam was trimmed and overemphasized in Provident 's subsequent denial of benefits Letters, dated January 12, 2022, and August 26, 2022.  Provident misstated that Dr. Gee indicated Mr. Talley did not suffer from Alzheimer's Disease, ignoring all prior medical visits' findings, which indicated that Mr. Talley experienced continuous symptoms similar to the symptoms of Alzheimer's disease.  Moreover, Dr. Gee included in his exam notes the finding that Mr. Talley posed risk nonetheless meaning based on his personal knowledge of Mr. Talley's brain PET changes and history of cognitive impairments, that Dr. Gee concluded during that specific exam on September 21, 2020, that Mr. Talley did not show signs to "suggest" AD but had either risk factors or prior symptoms indicative of that disease.  The meaning behind Dr. Gee's notes was that Mr. Talley could start experiencing at any moment Alzheimer Disease's symptoms, which was categorically different that Provident 's interpretation of the record to mean that Dr. Gee did not diagnose Mr. Talley with Alzheimer Disease.

58.    On January 20, 2021, during a telemedicine progress visit with Dr. Gee, Mr. Talley reported complaints of persistent fatigue and depression.  Dr. Gee again noted the diagnosis of cognitive impairment and indicated in his summary report the following: "Plan the CSF analysis for Tau and beta amyloid.  **The dementia process may be a reason for the fatigue or still part of the depression**."  Again, Dr. Gee referred to a dementia type process in his symptoms due to Mr. Talley's neurocognitive disorder.

59.    On February 24, 2021, Mr. Talley underwent a diagnostic lumbar puncture procedure, for his diagnosis of cognitive impairment and the prior abnormal brain PET scans from 2019 and 2020.  One of the tests performed on the sample of specimens collected from the procedure was the ADMAR K APOE GENOTYPE

Case No.:



ANALYSIS AND INTERPRETATION (SYMPTOMATIC), which is a test that evaluates the levels of the Phosphorylated-Tau protein to determine the presence of dementia symptoms in a patient.  On April 15, 2021, Mr. Talley had another telemedicine visit with Dr. Gee, still experiencing excessive sleepiness and difficulty with concentration. In his summary notes, Dr. Gee noted the following, that upon information and belief referred to Mr. Talley's results from the lumbar puncture procedure: "**Eschar noted diagnostics imply that he has a specific Alzheimer's related dementia.** His biggest problem is excessive fatigue and treatment options have been discussed. We will also get a more formal studies analysis. He was informed overall that it is seemingly good news does part of their not finding any specific disturbances indicating also developed some delay problems in his life." The notes also showed Mr. Talley still experienced "memory loss."

60.    Dr. Gee had consistently suspected in his treatment of Mr. Talley the presence of Alzheimer Disease symptoms but was not able to articulate a specific diagnosis of Alzheimer's Disease due to the fact that such disease is difficult to diagnose, and the symptoms follow more of a progression pattern as the patient advances in age.  However, Dr. Gee's medical records show unequivocally that Mr. Talley did suffer from a neurocognitive disorder causing moderate cognitive impairments that were sufficient to entitle Mr. Talley to long-term disability benefits.

61.    On March 1, 2021, Mr. Talley presented for a telemedicine visit with Dr. Gee with complaints of severe headache and received the diagnosis of "post-dural puncture headache and cognitive impairment."  Dr. Gee prescribed a stronger pain reliever.  During his follow-up exam on April 2, 2021, Dr. Gee noted: "Patient still with complaints of significant fatigue.  He is back on Vyvanse and has been treated by a psychiatrist, who suggested "Infectious disease "evaluation." On May 20, 2021, over two (2) years after Mr. Talley became disabled, during a telemedicine visit with



Dr. Gee, Mr. Talley continued to complain of excessive sleepiness and the need to

take two (2) naps per day, consistent with his continued cognitive impairment.

62.    On June 2, 2021, during a progressive telemedicine exam with Dr. Gee

regarding his ongoing cognitive issues, Mr. Talley complained of malaise and fatigue,

and issues with cognitive function.  In its summary, Dr. Gee reinforced his prior

diagnosis from treating Mr. Talley since 2019:

> "Mr. Talley has an identified diagnosis of mild cognitive impairment
> with a mild neurocognitive disorder along with other ongoing
> neurological disorders of migrainous headache and excessive fatigue and
> sleepiness.  The patient is being treated as aggressively as possible. His
> PET scan of the brain was equivocally abnormal and may increase his
> likelihood of further eventual development of progression to dementia.
> At this time, he does not have fulminant Alzheimer's disease. Patient is
> counseled."

63.    As Dr. Gee indicated above in Paragraph 63 of the Complaint, he treated

Mr. Talley as aggressively as possible and as a result Mr. Talley had another medical

test on June 14, 2021, a polysomnography test for his excessive sleepiness.  The test

recorded a sleepiness score of 14 compared to the normal sleep score of less than 10,

and Mr. Talley was diagnosed with "Periodic limb movement disorder", and

"snoring." On July 26, 2021, during a telemedicine visit, Dr. Gee diagnosed Mr.

Talley with: "1. Migraine without aura and without status migrainosus, not intractable

(Primary) 2. Mild cognitive impairment 3. Periodic limb movement disorder (PLMD),

after Mr. Talley complained of excessive fatigue." Dr. Gee prescribed him the

medication pramipexole. As evidenced in this exam, since February 12, 20219, Mr.

Talley continued to experience symptoms related to his cognitive impairment,

proving again that the neurocognitive disorder was not related to a mental behavioral

disorder, but to a degenerative brain disease.

64.    Dr. Gee continuously administered ongoing care and treatment to Mr.

Talley since 2018 and was in the best position to provide an opinion regarding Mr.



Talley's ability to return to work. On August 19, 2021, Dr. Gee provided an Attending Physician's Statement to Lincoln (Mr. Talley's second insurance policy), and a copy of that Statement was provided to Provident. Dr. Gee stated that he was unable to determine when Mr. Talley could return to work due to his need for treatment for his diagnosis of "mild cognitive impairment," "migraines," and "fatigue."

65.    Mr. Talley's September 13, 2021, cervical spine Xray showed: "Osteopenia with moderate degenerative change. Flexion extension views show limited range of motion but no dynamic instability. Fairly severe facet arthropathy and uncovertebral joint spurring and moderate cervical foraminal stenosis," which was consistent with the neck and back pain that Mr. Talley continued to experience daily. The Xray also showed unequivocally that Mr. Talley had "moderate to severe degenerative change."

66.    The fact that Mr. Talley's physical disability condition of progressive spinal degenerative disease was the reason for his limited range of motion and pinched nerves pain was also confirmed by Mr. Talley's Cervical Spine MRI results on September 23, 2021, that stated the following findings: "Multilevel disc osteophyte complex formation, facet arthropathy and uncovertebral joint hypertrophy resulting in moderate to severe neural foramina stenosis as detailed above."[2]  Mr. Talley was

---

[2] The Cleveland Clinic website describes the diagnosis of "foramina stenosis" as: "Foraminal stenosis is narrowing that happens in certain places around the nerves that come out of your spinal cord. It's a type of spinal stenosis that affects the neural foramen, a series of openings on both sides of your spine. Foraminal stenosis is like what happens to an electrical cord when you shut a door on it, wedging it between the door and frame. Eventually, the pressure on the cord can damage it, affecting how it conducts electricity. Likewise, foraminal stenosis can put pressure on affected nerves. Eventually, that can affect signals traveling through the nerve and cause nerve pain, and sometimes, permanent nerve damage." *See Foraminal*

Footnote continues on next page…

Case No.:

disabled due to a physical condition, in addition to his cognitive impairments and restrictions.

67.     On September 28, 2021, Dr. Gee discussed with Mr. Talley his continued complaints of pain and movement limitations, evaluated his recent medical tests, and referred him to physical therapy, and continued chiropractor's treatment because Mr. Talley reported that those sessions were alleviating his neck pain. Since December 2018, Mr. Talley received uninterrupted medical care and treatments for his ongoing medical conditions for his cervical degenerative disc disease. On the referral line, Dr. Gee indicated the reason for referral was "cervical spine neural stenosis facet arthropathy" which was another indication that Mr. Talley's degenerative disc diseases was progressing to the point that Mr. Talley needed to start physical therapy in addition to any pain medications.

68.     On October 6, 2021, Mr. Talley attended physical therapy with Intecore Physical Therapy. They gave a diagnosis of "radiculopathy, cervicothoracic regina; cervical spinal stenosis, and cervicalgia." During his evaluation, Dr. Michael Tejano, PT, DPT, noted the following history of diagnosis:

> Patient is a 60-year-old male c/o numbness down R shoulder as well as 'paralysis' of the R arm occasionally, which is very brief. He reports it has been at least a couple of years since the neck pain and arm numbness started but it has been progressing. He also complains of headaches occasionally and sometimes numbness of the L side as well. He c/o weakness in both hands as well. He reports all symptoms affect his ability to perform ADLs, especially lifting anything over 15 lbs. He has trouble trying to golf as well. Reports his "head gets tired" when reading and has to rest it on his fist but denies symptoms of blurry vision when looking down. He has not received PT in the past for his neck. He had

_____

*Stenosis*, The Cleveland Clinic, Diseases and Conditions, (Aug. 21, 2024, 10:14 AM), https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis

-27-

Case No.:



an MRI performed which revealed moderate-severe foraminal stenosis at multiple levels.

69.     As late as October 6, 2021, there was overwhelming evidence in Mr. Talley's file that support the conclusion that Mr. Talley was experiencing significant limitations and restrictions in his neck and arms, related to his cervical degenerative disease physical condition Mr. Talley could not sit for a prolonged period of time in front of a computer, drive to construction sites, or crawl and crouch to examine the installation and functionality of Johnson's units.  Mr. Talley noted on his therapy intake sheet that he suffered the following restrictions: "1) The pain is moderate at the moment; 2) It is painful to look after myself and I am slow and careful; 3) I can only lift very light weights; 4) I cannot do my usual work; 5) I can't read as much as I want because of moderate neck pain; 6) I have great difficulty concentrating when I want; 7) I can't drive my car as long as I want because of moderate pain."

70.     The physical therapy treatment listed the goal as returning to normal function without pain, showed Mr. Talley's pain level at 8 out of 10, and focused on Mr. Talley's muscle tenderness and neck pain and his problems with pain with ADL's, decreased ROM, decreased strength, impaired functional daily mobility and lasted six (6) weeks. Mr. Talley's functional outcome test neck index was 27/50, or 54%.

71.     Mr. Talley also continued consultations with Dr. Seyed Sajjadi, an Assistant Professor of Neurology, for observation of his cognitive impairments, and executive function deficit. He attended exams on September 28, 2020, and April 5, 2021, and was treated with the medication Aricept. Sajjadi noted in his medical visits file that he was treating Mr. Talley for his diagnosis of mild cognitive impairment, apathy, executive function deficit, somnolence, and chronic fatigue.

Case No.:



72.    On November 29, 2021, Dr. Gee completed an Attending Physician Statement that confirmed he still believed Mr. Talley was disabled and listed the diagnoses of "cervical disc disease" and "mild cognitive impairment," indicating that Mr. Talley experienced pain and impaired range of motion.

**Mr. Talley's Claim for Social Security Disability Income.**

73.    Provident 's erroneous denial of Mr. Talley's long-term benefits after twenty- four (24) months of payments[3] is in direct contrast with the Administrative Law Judge Robert Lenzini's ("Judge Lenzini") award of SSDI, who issued his Decision on November 3, 2020. The Social Security Administration reviewed Mr. Talley's medical records and found credible evidence to award him SSDI that Mr. Talley continues to receive to this present day.

74.    Judge Lenzini opined that Mr. Talley's medical conditions of "neurocognitive disorder, unspecified; depression, and cervical degenerative disc disorder," are severe enough for him to be considered "disabled since February 12, 2019, and eligible for social security disability benefits under sections 216(i) and 223(d) of the Social Security Act," and that Mr. Talley's residual functional capacity is insufficient to allow him to return to work.

75.    In his Decision, Judge Lenzini noted that "a PET scan showed decreased activity in the interior temporal and superior parietal lobes, which *could* indicate Alzheimer's disease." Additionally, Judge Lenzini found that "claimant has the residual functional capacity to perform less than full range of light work," "he can lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk six hours out of an eight-hour day; sit six hours of out of an eight-hour day; occasionally

---

[3] Edward received 29 months of long-term disability payments from Unum because Unum paid 5 additional payments under reservation of rights in order to investigate the claim.

Case No.:

reach overhead with bilateral upper extremities, frequently reach otherwise; occasionally climb ramps and stairs; occasionally climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; no prolonged gazing (holding head/neck in fixed position; and no quick rotation of neck. He is limited to simple, routine tasks; simple work-related decisions; occasional contact with coworkers; and no direct interaction with the public."

76.    Judge Lenzini stated the following findings of fact:

a) The claimant has not engaged in substantial gainful activity since February 12, 2019, the alleged onset date.

b) The claimant has the following severe impairments: neurocognitive disorder, unspecified; depression; and cervical degenerative disc disorder.

c) The claimant has the residual functional capacity to perform less than full range of light work as defined in 20 CFR 404.1567(b).

d) The claimant has the following degree of limitation in the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders' listings in 20 CFR, Part 404, Subpart P, Appendix 1:

   -  a moderate limitation in understanding, remembering, or applying information.
   -  a moderate limitation in interacting with others.
   -  a moderate limitation in concentrating, persisting, or maintaining pace; and
   - a mild limitation in adapting or managing oneself.

e) The medical evidence establishes that the claimant suffers from significant symptomatology from his impairments.

f) The claimant is unable to perform any past relevant work (20 CFR 404.1565). The claimant has past relevant work as a project manager, SVP 8, sedentary/light in exertion. The demands of the claimant's past relevant work exceed the residual functional capacity.

g) The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above.

h) Considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform.

Case No.: 

i) The claimant's substance use disorder(s) is not a contributing factor material to the determination of disability. The claimant's other impairments would not improve to the point of nondisability in the absence of the substance use disorder.

77. Despite Provident 's improper denial of long-term benefits, the Social Security Administration found that Mr. Talley qualified for long-term disability after examining his medical records and finding his symptoms credible.

**Provident 's Wrongful Termination of Mr. Talley's Disability Benefits and Mr. Talley's Subsequent Appeals.**

78. On May 19, 2021, Provident sent Mr. Talley a letter informing him that the maximum benefits period for his ongoing benefits would expire on August 11, 2021, because his benefits were being paid under the Limitations for Disability resulting from a Mental Disorder provision of the Policy.

79. On January 12, 2022, Provident provided an Initial Claim Decision and stated that Mr. Talley exhausted the mental disorder benefits as of August 11, 2021. Provident stated in that letter that:

> After review of We have determined that your client is not prevented by a physical (non-behavioral) illness or injury from performing the duties of his occupation. His disability, which has existed since February 12, 2019, remains the result of mild cognitive impairment that has a behavioral health etiology (depression). Further benefits are not payable, as we have already paid 24 months of benefits for your client's disability, the maximum available for disability resulting from a mental disorder.

80. In discussing Mr. Talley's restrictions and limitations, Provident's claim analyst ignored the overwhelming evidence in the medical records that showed that Mr. Talley's neurocognitive disorder and cervical degenerative disc disorder presented significant restrictions and limitations that prevented Mr. Talley from performing his job duties. In his November 26, 2021 Letter to Provident, describing

Case No.:



his current restrictions, Mr. Talley stated that he experienced the following restrictions and limitations: "1) sitting at his computer or drive to construction sites for more than 30 minutes without the need to lie down or recline to relieve the symptoms; 2) inability to visit and evaluate construction sited which require climbing, crouching to access small areas; 3) inability to concentrate due to physical pain, headaches and brain fog."

81.     In 2005, the company Unum Life Insurance Company of America ("Unum"), entered into a Settlement Agreement ("CSA") with the California Department of Insurance ("CDI"), in connection with a market conduct examination and investigation of Unum's disability claims handling practices. In this case, Defendant Provident Life and Accident Insurance Company is also bound by the terms of that Settlement Agreement, in its capacity as a subsidiary of Unum. The CDI had chosen not to join the 2004 multistate settlement agreements Unum entered with state insurance regulators of 48 states upon conclusion of a multistate market conduct examination of Unum's disability claims handling practices that became effective on December 21, 2004. In the CSA, Unum agreed to give significant weight to an attending physician's opinion. It requires Unum to:

> [g]ive significant weight to an attending physician's opinion, if the attending physician is properly licensed and the claimed medical condition falls within the attending physician's customary area of practice, unless the attending physician's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record. In order for an attending physician's opinion to be rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.

82.     In the CSA, Unum also agreed to the following, requiring it to offer every California claimant in writing of the right to request an independent medical examination at or just prior to the time it denies a claim:

Case No.:



**Claimants Informed of Right to Request IME**

As part of the information advising a California Claimant how to submit a claim or early in the process of reviewing an open claim and, in any event, prior to any decision being made to deny a recently submitted claim or to close an open claim, California Claimants shall be informed in writing that it is their right or the right of their attending physician (either directly or through the claimant's representative) to request an "independent medical examination" ("IME") of their medical condition, unless the decision is made to pay or continue to pay the claim.

83.     Provident violated the letter and spirit of the CSA when it favored the opinions of its paper reviewers over the opinions of Mr. Talley's treating physicians and did not state the "specific reasons why the [attending physicians'] opinion[s] [are] not well supported by medically acceptable clinical or diagnostic standards and [are] inconsistent with other substantial evidence in the record."

84.     Provident further violated the letter and spirit of the CSA when it did not give Mr. Talley the notification that he could request an IME at the time when Provident denied his long-term benefits payment past the twenty-four (24) months Mental Disorder Limitation. Provident included the notification of the right to request an IME in its Letter on October 30, 2019, when it received Mr. Talley's disability application, but not in the Letters discontinuing Mr. Talley's disability benefits.

85.     No proper notice of Plaintiff's right to an IME was provided prior to the time when Provident decided to discontinue Edwar's ongoing long-term disability payments due to the twenty-four (24) months Mental Disorder limitation in his Policy on January 12, 2022.  The CSA makes it clear that a notice should be sent early in the claims process *and* prior to the denial of a claim: "[Notice must be given] as part of the information advising a California Claimant how to submit a claim or early in the process of reviewing an open claim *and*, in any event, **prior to any decision being**

Case No.:



**made to deny a recently submitted claim or to close an open claim."** (Emphasis added).  Provident 's January 12, 2022, Notice Letter did not comply.[4]

86.     Unum has a history of erroneous and arbitrary claims benefits denials. As a subsidiary of Unum, Provident Life and Accident Insurance Company followed the same practices and procedures in reviewing its claims as Unum. As the Ninth Circuit as recognized in *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 933–34 (9th Cir. 2012):

> Numerous courts, including ours, have commented on Unum's history "'of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics,' " McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 137 (2d Cir.2008) (quoting Radford Trust v. First Unum Life Ins. Co., 321 F.Supp.2d 226, 247 (D.Mass.2004), rev'd on other grounds, *934 491 F.3d 21, 25 (1st Cir.2007)).

> Indeed, in Saffon, we attributed the trend of state prohibitions on discretionary provisions in insurance contracts to "the cupidity of one particular insurer, Unum–Provident Corp., which boosted its profits by repeatedly denying benefits claims it knew to be valid. Unum–Provident's internal memos revealed that the company's senior officers relied on ERISA's deferential standard of review to avoid detection and liability." 522 F.3d at 867; see also Radford Trust, 321 F.Supp.2d at 247 n. 20 (collecting cases).

> Moreover, the CSA notes that Unum was subject to "a multistate targeted examination" of its "claims handling practices," which resulted in a settlement agreement similar to the CSA. And the CSA was the product of investigations by the State of California into Unum's claims handling practices.

---

[4] The CSA applies to ERISA and non-ERISA plans subject to the jurisdiction of the CDI.  *See Cox v. Allin Corp. Plan*, 845 F. App'x 524, 525–26 (9th Cir.). Plaintiff is informed and believes that these provisions are also in Unum's Benefits Center Claims Manual for handling disability claims. It states: "We are required to notify claimants of their right to request an IME. See Claimant's Right to Request an IME." In the section entitled, "Claimant's Right to Request an IME," the manual states:
> Claimants must be notified of their right to request an IME:
> • at the start of each claim, and
> • if we are requesting updated medical information from the claimant and 5 years have elapsed since the last notification.

This misstates the requirement in the CSA that requires a notice be sent prior to denying or closing a claim.



87.     Despite the above-stated problems with their denial and in violation of the CSA, on August 26, 2022, Provident sent a letter to Mr. Talley's counsel, advising counsel that Provident had reviewed Mr. Talley's appeal of the January 12, 2022, initial denial decision and intended to uphold the prior decision that discontinued Mr. Talley's long-term disability benefits.

88.     Provident also selected to base its denial of benefits on cherry-picked statements from Dr. Gee's November 29, 2021, Attending Physician Statement that noted that Dr. Gee expected improvement over the next four to six months.   But Provident  did not specify what exactly would improve in Mr. Talley's functional capacity that would suddenly allow him to sit at a desk and focus for over eight (8) hours a day to schedule, oversee and review team project tasks; move his neck and body without continuous pain and the need to lie down or recline; and make it easier for him to lift and/or climb in small areas at construction sites, and drive to these constructions sites. Provident failed to justify its reliance on a single form completed by Dr. Gee that showed he was optimistic that Mr. Talley's current treatment at the time was producing results in alleviating his symptoms of his ongoing degenerative disease. Dr. Gee never indicated that Mr. Talley was ready to return to work in four to six months.

89.     Provident's claim evaluation for continued disability included a vocational consultant opinion by Mary Cloutier, a paid consultant of Provident , who suddenly switched the way she evaluated Mr. Talley's job duties in order to claim that the Social Security Administration only determined that Mr. Talley did not have the residual functional capacity to perform "skilled work," when in fact the Decision specifically stated that "the demands of the claimant's past relevant work exceed the residual functional capacity," and that "the claimant's acquired job skills do not



transfer to other occupations within the residual functional capacity" The vocational analyst indicated the following:

> Your client was employed as a Mechanical Project Team Leader, which is the equivalent to a Construction Project Manager. The duties of Construction Project Managers are managerial. They handle the planning, staffing levels, subcontractors, and deal with the budget. Crew members typically report to the Construction Project manager for their assignments…While constriction Project managers do a significant amount of work from the office, or form a construction trailer in some instances, to assess progress, resolve issues, view assets, and assess quality of work, and meet with individuals involving the project… This occupation typically requires 'light' work, exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Light work may require frequent weightbearing (standing and/or walking). The demands exceed those for sedentary work.

90.     Provident's vocational analyst disregarded the Social Security Administrative Law Judge's findings that Mr. Talley: 1) "is limited to simple, routine tasks; simple work-related decisions; occasional contact with coworkers; and no direct interaction with the public; no prolonged gazing (holding head/neck in fixed position); and no rotation of neck; and 2) "has a moderate limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace."

91.     Both of the neuropsychologists that personally examined Mr. Talley and prepared extensive evaluation reports - Dr. Bellone (twice) and Dr. Colonna (once) - produced opinions that Mr. Talley suffered from a neurocognitive disorder that placed moderate difficulties on his ability to focus, memorize, understand, interpret data, and communicate with supervisors, coworkers and peers. Yet, Provident 's vocational expert, stated in her "paper review," that Mr. Talley could perform a variety of physical tasks and drive to construction sites and evaluate, plan and execute work



assignments for a team of coworkers, sit for extending periods of time in front of a computer, and crouch, lift objects and crawl at construction sited in order to assess progress and resolve issues.

92.    Provident also stated in its claim denial Letter that: "We have concluded that, while the usual and customary cognitive demands of your client's occupation exceed his mental/cognitive Residual Functional Capacity as assessed by Social Security, his physical Residual Functional Capacity would allow him to meet the physical demands of his occupation." Provident failed to explain how Mr. Talley could return to work and perform only his physical aspects of his job, without performing most of his cognitive demands of his job, particularly the parts of reviewing data, assessing, and analyzing project and change orders, managing the crew assignments and compliance, and resolving issues.  Provident 's argument that Mr. Talley could work in a managerial type of position with only physical residual function capacity is misplaced and made in bad faith with the single purpose of discontinuing long-term benefits.

93.    Additionally, Provident failed to discuss in its denial letter the fact that Mr. Talley's medical records, exams, medical tests, and evaluations clearly showed that Mr. Talley's cognitive impairments were related to a non-behavioral medical condition of neurocognitive disorder, which is an exception to the Policy limitation for Mental Disorders. Thus, Mr. Talley is eligible to receive benefits after the expiration of the twenty-four (24) months since the onset of the disability.

94.    In reviewing Mr. Talley's medical history, Provident 's vocational expert Ms. Cloutier, even expressly opined regarding Mr. Talley's ability to use a computer in direct contradiction with the Social Security Administration's findings. Ms. Cloutier stated that: "One usual and customary physical demand of his occupation –

Case No.:



that of using the computer frequently – may exceed Social Security's Residual Functional Capacity restriction of no prolonged gazing (holding head/neck in fixed position). However, your client should be able to move his neck and shift position while using the computer and viewing the computer screen, as well as get up and stretch periodically, as recommended by OSHA." Ms. Cloutier proceeded to enumerate OSHA's recommendations for workstation computer posture to alleviate overused muscles that was applicable for any other workers using a computer, not a worker who suffered from a cervical degenerative disc disorder severe enough to render him disabled and unable to hold his head/neck in fixed positions. Moreover, Ms. Cloutier is not qualified to give a medical opinion on whether Mr. Talley should be able to move his neck and shift positions during prolonged computer use, which is another example of the egregious and erroneous claim review process utilized by Provident to review Mr. Talley's continued eligibility for disability.

95.     Provident based its denial of long-term disability benefits on a "paper review" of Mr. Talley's file by an internal medicine physician on its payroll, Dr. Joseph A. Antaki, M.D., who failed to personally examine Mr. Talley, and Dr. Vaughn Cohan, M.D., a neurologist, who also did not examine Mr. Talley.

96.     On August 6, 2021, Dr. Antaki prepared a summary report after reviewing Mr. Talley's medical records. Based purely on his file review and a brief conversation with Dr. Gee on August 5, 2021, Dr. Antaki concluded that "The records do not support R & Ls [restrictions and limitations] due to a non-BH [behavioral health] condition...," despite conceding that "Mr. Talley's neuropsychological testing report concluded he has MCI [mild cognitive impairment]." However, Dr. Antaki failed to provide any rationale or explanation in his opinion for how depression or other behavioral health conditions could cause the observable degenerative disease brain damage, visible on Mr. Talley's imaging studies MRIs and CT scans, because

depression typically cannot cause physical abnormalities in the brain. Specifically, depression would not typically cause the decreased FDG (fluorodeoxyglucose) activity in the anterior temporal and superior parietal lobes, consistent with Alzheimer's disease, as evidenced by Mr. Talley's April 3, 2019, and subsequent April 27, 2020, PET scans, and cognitive impairments discussed in Mr. Talley's mental evaluations in March 2019 and in July of 2020 by Dr. Bellone.

97.     Dr. Antaki also reached the erroneous medical conclusion that: "Though the Insured has degenerative disease of the cervical spine with moderate to severe foraminal stenosis as described on the 9/24/21 MRI, the records do not support the Insured would be incapable of performing the physical occupational demands." Dr. Antaki based his medical opinion, citing the following medical records: "On the 5/20/21, 6/2/21, 7/26/21 and 9/28/21, physical exam reports from the AP describe: No motor or sensory deficits No pronator drift There is normal coordination on finger to nose and rapid alternating movements." However, Dr. Antaki did not explain the results from the imaging MRIs and Xray's that showed consistently from 2018 until 2021, that Mr. Talley experienced significant cognitive symptoms of memory loss, excessive sleepiness, migraines, significant pain, and limitations of movement in his neck and numbness and tingling in his extremities. Dr. Antaki did not take into consideration Mr. Talley's complaints at his progress visits with Dr. Gee, Dr. Sajjadi, or his 2021 physical therapy's statements that showed Mr. Talley could not perform the daily activities of his life like reading, taking care of himself, driving, scheduling, and reading without the need to take a break or a nap.

98.     Dr. Antaki conveniently failed to note in his opinion that according to the April 27, 2020, brain PET metabolic eval findings, the test showed: "When compared to the prior PET/CT there is similar decreased FOG avidity involving the bilateral superior parietal lobes as well as the anterior temporal lobes. There is



intracranial vascular calcification. • There is preservation of gray-white differentiation with few scattered subcortical hypodensities." According to the April 20, 2020, brain MRI impression, the test showed: "Very few foci of T2/FLAJR increased signal in the frontal and temporal lobes white matter which are nonspecific and may represent small vessel ischemic changes, migraine disease: or less likely demyelinating process." According to the April 3, 2019, brain PET metabolic eval impression, the test showed: "Decreased FDG activity in the anterior temporal lobes and superior parietal lobes consistent with Alzheimer's disease."

99.    On January 6, 2022, Dr. Vaughn Cohan, M.D., neurologist prepared a Designated Medical Officer (DMO) Review Response report for Provident, after reviewing Mr. Talley's medical records. Dr. Cohan concluded that: "The relatively acute onset of symptoms, the absence of gradually progressive cognitive issues, the absence of a family history of dementia, and the claimant's age at onset of cognitive complaints would be atypical of a diagnosis of Alzheimer's disease.  PET scans performed on year apart were stable and did not demonstrate progression of findings that would be expected with Alzheimer's disease."

100.  Dr. Cohan did not interview Mr. Talley and did not consult any of his treating physicians that have been treating Mr. Talley in the prior five (5) years to determine if there was any change in Mr. Talley's medical symptoms. Dr. Cohan mentioned two exam notes from January 7, 2020, during which Mr. Talley's physician Dr. Gee supposedly stated that "claimant's cognitive issues represent mild cognitive impairment", and August 4, 2021, Dr. Gee's note that stated that "the claimant did not have dementia, but he did suspect mild cognitive impairment of uncertain etiology."



101.   Dr. Cohen's opinions about Dr. Gee's evaluations and diagnoses of Mr. Talley were incorrect, as the medical records contain multiple statements by Dr. Gee that support the conclusion that Mr. Talley did suffer from a neurocognitive disorder that caused continuous cognitive impairments. Dr. Cohen never analyzed or interpreted any of Dr. Gee's multiple notations and opinions since 2018 that indicated he believed Mr. Talley had symptoms of dementia, specifically Alzheimer's disease. Dr. Gee referred Mr. Talley for medical tests, MRIs, brain PET scans, another neurologist, a psychiatrist, and treated regularly Mr. Talley for his cognitive impairments. Yet, Dr. Cohen selectively interpreted the medical file to misstate that Dr. Gee did not believe that Mr. Talley had a neurocognitive disorder to suit Provident 's narrative and subsequent denial of benefits.

102.   Dr. Cohan even misstated in his "paper review" the results of the Neuropsychological Evaluation test, performed on July 14, 2020, by Dr. Bellone. Dr. Cohen stated that the examiner noted that the test results should be interpreted with caution and did not indicate the presence of Alzheimer's disease. Contrary to his analysis, Dr. Bellone stated the following:

> Etiology and impressions: The PET scan of the brain from over a year ago showed "decreased FOG activity in the anterior temporal lobes and superior parietal lobes consistent with Alzheimer's disease" (AD). AD is relatively rare in Mt. Talley's age range (especially with no family history) and does not typically first present with psychiatric symptoms (i.e., anhedonia and apathy).
>
> **Still, it is possible that he has an atypical AD clinical presentation**. The general decline in test performance over the past year does fit with AD, especially since this decline occurs in the context of substantial mental health treatment (medication management, IOP, individual therapy) and reports of improved mood (i.e., this now argues against a psychiatric etiology). That being said, an updated PET scan showed no change in metabolic activity-if AD were present, reduced temporoparietal metabolic activity would have been predicted over the year. To reiterate, **it is possible that Mr. Talley has atypical, early-onset AD,** but this does not fully fit with the existing data/presentation.

Case No.:



103.   In every patient, Alzheimer disease progresses at different speeds depending on the lifestyle and overall medical health. Just because Mr. Talley is not speedily progressing into a deteriorating medical state and not exhibiting severe symptoms of Alzheimer disease, it does not follow that with reasonable degree of medical certainty Mr. Talley does not show beginning stage symptoms of Alzheimer's Disease. This conclusion is supported by the presence of abnormalities in Mr. Talley's brain scans that are not consistent with psychiatric etiology.

104.   Moreover, Dr. Cohan did not examine Mr. Talley to evaluate if his symptoms rendered Mr. Talley disabled and unable to return to work. He was simply trying to match Mr. Talley's symptoms from Mr. Talley's medical files to a behavioral mental disorder diagnosis to deny continued disability coverage. That is not the standard of medical care diagnosis or the standard for evaluating if a long-term disability patient has recovered from the symptoms of his medical condition to allow him to return to gainful employment.

105.   The physicians that Provident retained to opine on Mr. Talley's medical disability discounted the findings of the Administrative Law Judge Lanzini, who found that Mr. Talley had been disabled from February 12, 2019, onward and that Mr. Talley's severe impairments of neurocognitive disorder, depression, and cervical degenerative disc disorder rendered him unable to perform any past relevant work.

106.   There are multiple issues with the conclusions of Provident's medical consultants and thus with Provident's benefits decision that was based on them. First, Drs. Antaki and Dr. Cohen are Provident's paid in-house consultants who have been used repeatedly by Provident in the past to give disability opinions, which demonstrates their obvious bias in favor of the insurance industry. The Supreme Court has recognized that fiduciaries, such as Provident, use medical reviewers on a regular basis. The concern arises from the fact that the physicians may be financially



1  motivated to render opinions in favor of the insurer. *See Black & Decker Disability*

2  *Plan v. Nord*, 538 U.S. 822, 832, 155 L.Ed.2d 1034 (2003).

3

4      107.  Provident 's physicians failed to examine or even speak with Mr.

5  Talley, even though the Policy permitted it. Therefore, their opinions, based purely

6  on a "cold file review" of Mr. Talley's medical records, carry far less weight than

7  the opinion of his treating specialists, who regularly examined him in person for

8  over four years and consequently gained great insight into his work limits. *See, e.g.,*

9  *Sullivan v. The Prudential Insurance Co. of America*, 2014 WL 3529974, at *33

10  (E.D. Cal. Jul. 15, 2014). Provident 's failure to have Mr. Talley examined by its

11  physician consultants raises questions about the credibility of these physicians'

12  opinions and the thoroughness and accuracy of Provident 's benefits decision. *See*

13  *Shaw v. AT&T*, 795 F.3d 538, 550 (6th Cir. 2015).

14

15      108.  Provident physicians acknowledged in their reviews that Mr. Talley had

16  a degenerative disease of the cervical spine, with moderate to severe foraminal

17  stenosis as described on the September 24, 2021, MRI. However, the physician

18  concluded that "the medical records do not support associated motor abnormalities

19  that would preclude your client from performing the physical demands of his

20  occupation, including computer use, while following posture guidelines and

21  incorporating "micro" breaks." However, both Dr. Antaki and Dr. Cohen failed to

22  recognize or evaluate the medical records that show that Mr. Talley's disc

23  degenerative disease was diagnosed as early as December 2, 2018, and that Mr.

24  Talley's symptoms resulting from that medical condition had been consistent and

25  present since that date. Mr. Talley experienced constant neck pain since 2018 to the

26  point that he could not even rotate his neck. Mr. Talley had intermittent

27  numbness/paralysis, resulting in loss of control of arms and hands that was mentioned

28  by many of his treating physicians and noted in many of Mr. Talley's medical records.



Mr. Talley attended ongoing physical therapy sessions to maintain and improve the movements of his extremities, and chiropractic sessions to alleviate his pain.

109. None of Mr. Talley's physicians noted at any point in time that Mr. Talley's symptoms associated with his disc degenerative disease have improved or resolved. However, Provident 's physician made the following findings in his "paper review": 1) "On the May 20, 2021; June 2, 2021; July 26, 2021; and September 28, 2021 physical exams, your client's physician described no motor sensory deficits and no pronator drift, and there was normal coordination on finger-to-nose rapid alternating movements"; 2) "As the October 6, 2021 evaluation with physical therapy, your client's motor strength of the upper extremities was graded at 4, 4+, or 5/5, which is consistent with the ability to move upper extremity muscle groups against resistance"; 3) "The imaging studies identified multi-level disc disease without "dynamic instability" or symptoms warranting surgical intervention, and your client reported improvement with chiropractic care, to include reduction in symptoms."

110. Provident concluded that Mr. Talley did not suffer from pain and movement limitations based on finger-to-nose rapid alternating movement tests and motor strength of his upper extremity muscle groups. Such conclusion was inconsistent with Mr. Talley's medical records, MRIs and CT scans, Mr. Talley's treating physicians' opinions that Mr. Talley's had disabling symptoms of cervical spine degeneration, the Social Security Administration's findings of disability due to a cervical degenerative disease and neurocognitive disorder, and Mr. Talley's detailed complaints of chronic neck pain and limbs numbness that prevented him from turning his head and sitting for prolonged periods of time.

-44-

Case No.:



111.   Provident's unethical practice of creating medical opinions that suit their denial of benefits is evident by a Letter sent by Provident's medical consultant, Dr. Joseph A. Antaki, on December 15, 2021, to Dr. Gee.   It stated the following:

> I was trying to reach you to discuss the physical restrictions/limitations for Mr. Talley. Though I understand he has cervical spine degenerative changes, I did not find the information in the records was sufficient to support restrictions/limitations that would preclude Mr. Talley from performing his occupational activities, which include: • Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects • Frequent weight bearing (standing/walking) and sitting • When using a computer, follow OSHA guidelines including incorporating "micro" breaks.
>
> Though Mr. Talley has decreased range of motion of the cervical spine with associated neck pain, he has intact upper extremity neuromuscular function described. He has been receiving chiropractic treatment which he reported has helped. Surgery was not indicated.
>
> Do you agree with the above? ___Yes __No __ No Opinion
> If not, is there other information you can provide at this time to help me understand your opinion?
>
> Signature _____ Date _____ _ Joey R. Gee, DO

112.   On December 15, 2021, Dr. Gee returned the above Letter signed on the bottom by fax, but Dr. Gee **DID NOT** mark if he agreed or disagreed with any of the statements that Dr. Antaki made in his Letter, because they were incomplete and misstated the medical history and Mr. Talley's diagnoses.   However, this failed attempt of Provident to summarize and bend the medical facts of Mr. Talley's medical conditions to support a finding that he did not have any limitations or restrictions to return to work is another example of Provident 's unethical and bad faith practices in reviewing the claim files.

Case No.:



113. A degenerative cervical disc disease has symptoms that are always present but are aggravated based on the daily activities, posture, and movements of the patient. According to an article describing the symptoms, patients with this condition "feel a sharp or constant pain in their back and neck, and the exact symptoms will depend on where the weak disk is and other changes it has caused. Common signs include pain that feels worse when you sit and better when you move and walk; pain that feels worse when you bend, lift, or twist; pain that gets better when you change positions or lie down. In some cases, degenerative disk disease can lead to numbness and tingling in your arms and legs. It can also cause your leg muscles to become weak. This means the damaged disks may be affecting the nerves near your spine."[5]

114. Dr. Antaki did not disagree that Mr. Talley suffered from a cervical degenerative disc disorder. But he applied the information from Mr. Talley's medical records incorrectly, stating that Mr. Talley lacked the physical limitations and restrictions to perform his job because Mr. Talley's imaging tests of the spine and symptoms did not warrant surgical intervention. The treatment options of a medical condition should not be decisive or have any impact on whether a disability condition is present that renders the claimant eligible for long-term disability benefits. The focus of the evaluation should be on the ongoing symptoms that are placing limitations and restrictions on the claimant performing his daily job tasks.

115. Provident 's internal medicine physician, Dr. Antaki, who is not a specialist in the field of neurology, decided to cherry pick Mr. Talley's symptoms regarding his cognitive impairment and the presence of neurocognitive disorder. He

---

[5] *See,* Medically Reviewed by Jabeen Begum, M.D./Written by Theresa Dumain, Matt McMillen, *What is Degenerative Disc Disease? October 25, 2023* (Aug. 21, 2024, 11:31 AM), https://www.webmd.com/back-pain/degenerative-disk-disease-overview

focused on discussing Mr. Talley's symptom of excessive sleepiness and stated that "Your client's sleep onset latency was 14 minutes, which is normal and is not consistent with a diagnosis of narcolepsy or excessive daytime sleepiness/hypersomnia." The sleep test showed that normal ranges were less than 10 minutes. Provident 's physician even misinterpreted and misstated the test result to suit Provident 's narrative.

116.   Provident's physician also noted that: "A Maintenance of Wakefulness Test (to assess ability to stay awake) would ordinarily be considered in the case of excessive sleepiness resulting in restrictions and/or limitations, but the records do not indicate that such a test was performed." The argument that only a single test of the ability to stay awake would prove limitations and restrictions on work abilities is placing a heightened burden on any claimant and is not supported by any of Mr. Talley's treating physicians' evaluations. Mr. Talley had to take two naps a day for the past several years.  Mr. Talley's physicians referred him to a Sleep Evaluation that showed he did experience abnormal sleepiness symptoms that could be related to his neurocognitive disorder.

117.   Provident's physician discussed Mr. Talley's migraine headaches and stated that "the information reviewed in the medical records is not consistent with the presence of migraines of a severity that supports restrictions and limitations, because: "the records do not indicate that therapy for migraine (for acute treatment or for prophylaxis) was prescribed and then response assessed; the records do not describe your client presenting at office visits, or in more acute care settings, with intractable migraine with associated symptoms."  The opinion that a claimant needs to report to urgent care or the Emergency room with migraine headaches to show limitations and restrictions on his ability to perform his job is equally erroneous and misplaced. Mr. Talley took medications for migraines, took several naps per day, and rested as much



as he could to alleviate the symptoms associated with migraine headaches. Moreover, contrary to Provident's "paper review" findings, Provident 's claim file also included Dr. Gee's office visit records from September 26, 2018, which noted that Mr. Talley did in fact visit the Emergency Department with complaints of significant headache in the forehead that radiated to the vertex, and that he was treated with (three) 3 doses of methylprednisolone without benefit or effect.

118.  Moreover, Provident completely misinterpreted the medical records from Mr. Talley's visit with Dr. Gee on September 28, 2021, during which Dr. Gee noted that in addition to cervical disc disease, Mr. Talley also had a "cervical radiculopathy." This diagnosis, which in lay terms means "pinched nerve" was in addition to and related to Mr. Talley's degenerative disc disease, which caused further pain and restrictions of movement. Provident misinterpreted the visit to indicate that Mr. Talley's disability was improving, and he had a lack of symptoms to require surgical intervention. Dr. Gee's summary notes from that visit stated: "Patient has multilevel cervical stenosis, neuroforaminal narrowing, and osteophyte formation with discs. At this time do not feel this appears surgical given the lack of symptoms. Pain management may be able to assist with his pain should it worsen, but at this time physical therapy is encouraged. MRI was reviewed with the patient." Not only did Dr. Gee indicate that Mr. Talley continued with pain complaints related to his degenerative disc disease, but he also referred him to physical therapy to manage the symptoms and pain.

119.  Provident focused on discussing Mr. Talley's excessive sleepiness, migraines, and speech/language pathology notes, instead of the Brain MRIs and PETs in 2019, and 2020, that all showed that Mr. Talley's cognitive impairments were not based on a behavioral-health condition. Provident did not explain or address Mr. Talley's neuropsychological assessment result in 2020, that showed that Mr. Talley's

Case No.:

"performance declined on nearly all measures compared to 2019, in particular processing speed, executive functioning and learning and memory."

120.  Even though Provident concluded in its Denial Letter on January 12, 2022, that "the usual and customary cognitive demands of your client's occupation exceed his mental/cognitive residual functional capacity as described by the ALJ," Provident  never discussed the overwhelming medical records that showed that Mr. Talley's cognitive impairments were related to a neurocognitive disorder that was significantly different than a disability from a "mental disorder" based on a behavioral health condition that would allow Mr. Talley to continue receiving disability benefits under the exclusion of medical conditions, which are not subject to the twenty-four (24) months Mental Disorder limitation of the Policy.

121.  On July 12, 2022, Mr. Talley submitted his appeal, via his prior attorney, Roger S. Hutchinson, that requested Provident to reverse its claim decision and provide benefits to Mr. Talley beyond August 11, 2021, until those benefits were exhausted at Mr. Talley's retirement age of 65, which was the maximum benefit period under the Policy.

122.  Attached to Mr. Talley's Appeal were records from Mr. Talley's physicians that indicated that Mr. Talley suffered from a neurocognitive disorder, from major depression, and cervical degenerative disc disorder that placed significant mental and physical restrictions and limitations on Mr. Talley's ability to work. Mr. Talley's personal statement submitted in support of his appeal described why he was unable to function at his previous level and was unable to perform the substantial and material duties of his occupation in the usual and customary way.

Case No.:



123.   In its August 26, 2022, Letter that denied Mr. Talley's appeal, Provident reiterated that Mr. Talley's policy had a benefit limitation for mental disorders, which limited mental disorder benefits to twenty-four (24) months, and that on August 11, 2021, Mr. Talley's benefits were exhausted. Provident attempted to justify its denial by stating the following: "While our claim file is consistent with the onset date of disability in which mental disorder benefits were approved and paid, the decision on appeal differs from the SSA claim file as we possess additional information beyond the initial SSA approval date. We believe this additional information has compelling evidence, as outlined above, that your client is not disabled from a non-behavioral health condition. Records support your client's conditions have improved such that he could perform his occupation."

124.   However, Provident failed to explain what additional information beyond the initial SSA disability approval was indicative that Mr. Talley's irreversible neurocognitive disorder somehow improved, or that Mr. Talley's cervical degenerative disc disease did not cause restrictions and limitations to his daily tasks. There are no medical records in the claim file that show Mr. Talley's treating physicians indicated that Mr. Talley obtained full recovery or that his symptoms did not present functional limitations to Mr. Talley's ability to return to work.

125.   Provident failed to acknowledge and explain the overwhelming medical evidence in Mr. Talley's claim file that clearly indicate that Mr. Talley's cognitive impairments were related to a non-behavioral health condition and the result of a brain disease, which showed degenerative changes in the brain on Mr. Talley's 2019 and 2020 brain PET scans.

126.   Provident 's decision to deny Plaintiff's disability benefits based on the "paper reviews" of Drs. Antaki and Cohen was improper, as such a course of action

Case No.:

has been criticized by the Ninth Circuit. *See Montour v. Hartford Life & Accident*, 588 F.3d 623, 630 (9th Cir. 2009) (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

127.   An insurer's reliance on paper reviewers who present their opinions in a conclusory fashion, making it unclear how they reached opinions that differ from those of an insured's attending physicians, is improper, because such conclusions should not be relied upon over the opinions of the insured's attending physicians. *See Carrier v. Aetna Life*, 2015 WL 4511620, at *12-13 (C.D. Cal. July 24, 2015).

128.   Provident's failure to explain what additional information was needed to support Plaintiff's claim for benefits was a wrongful failure to engage with Plaintiff in a "meaningful dialogue." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011) (holding that, where the administrator issues a denial based on absence of medical evidence, in order to satisfy the "meaningful dialogue" requirement, the administrator is obligated to state in plain language what additional evidence it needed). Here, Provident failed to explain what sort of evidence was required from Mr. Talley outside of that which he had already provided and what Provident had already obtained.

129.   By highlighting statements in the claim file that support a denial of Mr. Talley's claim, while ignoring pertinent evidence to the contrary, both Provident and its physician consultants engaged in an arbitrary and biased handling of Mr. Talley's file. That is improper under the law and establishes that Provident's decision was incorrect.[6]

---
[6] *See Winkler v. Metropolitan Life Ins. Co.*, 170 F.App'x 167, 168 (2d Cir. 2006) (stating that an insurer "may, in exercising its discretion, weigh competing evidence,

Footnote continues on next page…

Case No.:

130. Given that Mr. Talley's treating physicians' diagnoses were based on multiple in-person examinations and on reviews of objective exam findings, Provident had no basis on which to deny continued disability benefits. Although an insurer is not obligated to afford special weight to the opinion of a treating physician, it must credit reliable evidence from a treater and cannot disregard it without an adequate explanation. *See Rowell v. Aviza Tech. Health & Welfare Plan*, 2012 WL 1672497, at *15 (N.D. Cal. May 14, 2012).

131. Courts have typically afforded greater weight to the opinions of physicians who have treated the claimant for an allegedly disabling condition for a long period of time.[7] The more detail a physician provides concerning the bases for his or her diagnosis and opinion, the more weight his or her conclusions is afforded.[8]

---

but it may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary"); *Stuart v. CVS Corp.*, 2010 WL 890181, at *6 & n. 3 (E.D. Mich. Mar. 10, 2010) (finding an administrator's decision to deny benefits to be arbitrary and capricious where a file-review physician's report indicated that the physician had "selectively cherry-pick[ed] the medical records to support his non-disability finding").

[7] *See, e.g., Kibel v. Aetna Life Ins. Co.*, 2015 WL 858751, *7 (C.D. Cal. Feb. 26, 2015) ("The record's great constant is Dr. Andersson: he was a board-certified neurologist that treated Ms. Kibel from her disease's inception, including numerous in-person examinations. Thus, his reports are very credible"); *Hodjati v. Aetna Life Ins.*, 2014 WL 7466977, *14 (C.D. Cal. Dec.29, 2014); *Oldoerp v. Wells Fargo & Company Long Term Disability Plan*, 12 F.Supp.3d 1237, 1255 (N.D. Cal. 2014) ("when an in-person medical examination credibly contradicts a paper-only review conducted by a professional who has never examined the claimant, the in-person review may render more credible conclusions"); *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (ascribing more weight to the opinions of physicians who personally examined the patient and described plaintiff's inability to work in great detail).

[8] *See, e.g., Carrier v. Aetna Life Ins. Co.*, 2015 WL 4511620, *12 (C.D. Cal. July 24, 2015) ("Nevertheless, the Court finds Dr. Corrado's conclusions sounder than those presented by the peer reviewers. Many of the opinions rendered by these reviewers are presented in conclusory fashion, making it unclear how they reached such starkly contrasting results from those of Dr. Corrado despite reviewing the same materials"); *Ondersma v. Metro. Life Ins. Co.*, 2007 WL4371422, at *5 (N.D. Cal. Dec. 12, 2007) ("Here, by contrast, the opinion offered by Dr. Dixit is not conclusory in nature. The basis for his opinion is disclosed. Specifically, he details particular symptoms from which plaintiff suffers, including symptoms he directly observed or found to exist as a result of his examinations; further, he identifies

Footnote continues on next page…

Case No.:

132.   Given the foregoing circumstances, Mr. Talley does not have the capacity to engage fully in his occupation as a Project Team Leader due to symptoms associated with his underlying objective medical conditions of neurocognitive disorder and cervical degenerative disc disorder.  His symptoms prevent him from completing all the substantial and material aspects of his job.

**Mr. Talley's Recent Medical Tests Support Continued Disability with Cognitive and Physical Impairments.**

133.   New medical records, obtained after the denial of continued benefits on August 26, 2022, showed that Mr. Talley's degenerative neurocognitive disorder is still present.  Mr. Talley's most recent PET scan on February 21, 2024, revealed that Mr. Talley still had the presence of "mild relative decreased activity is again seen in the parietal lobes and anterior temporal lobes," which is consistent with a continued cognitive impairment diagnosis.

134.   Provident should immediately reverse it denial and restart paying Mr. Talley long-term disability payments that extend beyond the twenty-four (24) months Mental Disorder Limitation because Mr. Talley has both cognitive and physical limitations and restrictions that significantly impair his ability to resume his work.

135.   Mr. Talley cannot perform his job tasks because he has a significant cognitive impairment related to his "neurocognitive disorder" that is not simply related to any behavioral mental illness, as claimed by Provident in direct contradiction to all medical experts, who provided persuasive medical opinions supporting the conclusion of neurocognitive medical disorder, after extensive

functional limitations typically resulting from such specified symptoms and explains why plaintiff's symptoms, in particular, would cause her to be so limited"); *Williams v. United Omaha Life Insurance Co.*, 2013 WL 5519525, at *12 (N. D. Ala. Sept. 30, 2013).

Case No.:

evaluations and examinations of Mr. Talley. He also has physical limitations due to the pain and movement restrictions resulting from his cervical degenerative disc disorder.

136.   To date, Mr. Talley's medical conditions have not been resolved and unfortunately have gotten worse, due to the progression of his medical symptoms. Mr. Talley cannot perform the following tasks that are essential to his job occupation: managing projects, reviewing orders, explaining technical terms, communicating with people, making independent decisions, directing, planning, controlling activities, engaging in problem-solving, negotiations, critical thinking, hazard awareness, applying technical knowledge to project management, managing personnel and material and financial resources, reviewing financial systems, and exercising quality control.

137.   Mr. Talley's cognitive impairment paired with his physical limitations affect the quality of his day-to-day life.  Mr. Talley takes two naps a day in the morning and afternoon, each lasting up to an hour or two, he sleeps on average 8 hours during the night.  Mr. Talley can only drive short distances in his vehicle with multiple breaks. His errands include going to treatment appointments and basic errands excluding grocery shopping and cooking.  Mr. Talley cannot perform financial tasks like managing finances or balancing a checkbook, mathematical functions, any project or managing tasks or daily planning.  He experiences issues with memory loss, attention deficit, difficulty in concentration, fatigue, speech difficulties, headaches, and has difficulty in communicating with other people. Mr. Talley has neck and back pain and tingling and loss of control of his extremities. Mr. Talley cannot climb, move objects or crouch in tight places.

Case No.:

138.   As part of his LTD claim, Mr. Talley provided Defendants with any information that it requested, and he granted Defendants full access to his medical records.   The medical records continue to support his claim for continued LTD benefits.

139.   Courts have made clear that "an administrator abuses its discretion .. . when it engages in a 'selective review of the administrative record' to justify a decision to terminate coverage." *Metropolitan Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007).   Courts in the Ninth Circuit often overturn a claim decision when denials rely on selected evidence from the claim file or are based on an incomplete set of facts, where the administrator has not sought out additional information.   *See, e.g., Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 974 (9th Cir. Cal. 2006); *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 873 (9th Cir. Cal. 2008); *Lavino v. Metro. Life Ins. Co*., 779 F.Supp.2d 1095, 1113 (C.D. Cal. 2011) (MetLife abused its discretion by making "very selective references" to the medical file).

140.   Here, Provident focused on certain examinations or aspects of the medical evidence favorable to a termination of benefits, but refused to acknowledge that, in fact, several different doctors, Dr. Gee, Dr. Bellone, Dr. Colonna, Dr. Sajjadi, and etc., evaluated Mr. Talley and opined that Mr. Talley suffers from a neurocognitive disorder and cervical degenerative disc disorder.

141.   The proper standard of review in this case is de novo, as Provident does not have valid discretionary authority pursuant to California Insurance Code Section 10110.6.   *See* Cal. Ins. Code §§ 10110.6(a)–(d), (g); *Murphy v. Cal. Physicians Serv*., 213 F.Supp.3d 1238 (N.D. Cal. 2016).   De novo review means that the court "considers the matter anew, as if no decision had been rendered." *Lin v. Metro. Life*

Case No.:



*Ins. Co.*, 2016 WL 4373859, at *5 (N.D. Cal. 2016) (quoting *Dawson v. Marshall,* 561 F.3d 930, 932–33 (9th Cir. 2009)).

142.  Under a de novo standard of review, basic principles of ERISA apply, including the duty of loyalty to interpret and apply plan terms "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[.]" ERISA § 404(a)(1)(A), 29 U.S.C. § 1104; *see also Shaw v. Delta Airlines, Inc*., 463 U.S. 85, 90 (1983) (ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans"); *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985) ("to protect contractually defined benefits"); *see generally*, 29 U.S.C. § 1001 (setting forth congressional findings and declarations of policy regarding ERISA).

143.  Under a de novo standard of review, Mr. Talley meets the requirement for benefits under the terms of the Plan because he is "Disabled" within the meaning of the Plan.

144.  Regardless of the standard of review this Court applies, Provident reached an incorrect decision, given the overwhelming medical records and other evidence presented during the claim, which established that Mr. Talley was and is disabled within the meaning of the Plan. Mr. Talley exhausted all mandatory administrative remedies under the Plan and has the right to bring a legal action for benefits under ERISA Section 502(a).

145.  Mr. Talley is now and at all relevant times has remained "Disabled" as defined in the Plan and has now and at all relevant times convincingly demonstrated his total disability through medical records and other documents, information, and correspondence.

Case No.:



**FIRST CAUSE OF ACTION**

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest

under ERISA Plan – 29 U.S.C. sections 1132(a)(1)(B), (g)(1)

(Plaintiff against Provident Life and Accident Insurance Company and Does 1

through 10)

146.    Plaintiff incorporates the previous paragraphs as though fully set forth herein.

147.    ERISA section 502(a)(1)(B), 29 U.S.C. section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify him rights to future benefits under the terms of a plan.

148.    At all relevant times, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's claim for LTD benefits under the Plan, and by related acts and omissions, Provident violated, and continues to violate, the terms of the Plan and Plaintiff's rights thereunder.

149.    Provident failed to follow even the most rudimentary claims processing requirements of ERISA and the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. section 1133(2).  Thus, even if the Plan vests discretion in Provident to make benefit determinations, no deference is warranted with regard to Provident's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").



150.   A "prudent person" standard is imposed on ERISA fiduciaries.   *See* 29 U.S.C. §1104(a)(1)(b).   A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.   *See* 29 U.S.C. section 1104(a)(1).   Under ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants, or its beneficiaries.   Provident's handling of Plaintiff's disability benefit claim falls far short of these standards.

151.   For all the reasons set forth above, the decision to deny disability insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan and contrary to law. Provident abused its discretion in deciding to deny this claim as the evidence shows its denial decision was arbitrary and capricious. Further, Provident's denial decisions and actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008). Provident's denial of Plaintiff's claim constitute an abuse of discretion.

152.   As a direct and proximate result of Provident's denial of disability benefits, Plaintiff has been deprived of LTD benefits from and after January 12, 2022.

153.   As a direct and proximate result of the denial of his claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 29 U.S.C. section 1132(g)(1).



154.    A controversy now exists between the parties as to whether Mr. Talley is disabled as defined in the Plan and therefore entitled to LTD benefits.  Mr. Talley seeks the declaration of this Court that he meets the Plan definition of disability and is entitled to benefits under the Plan.  In the alternative, Mr. Talley seeks a remand from the claim administrator for a determination of Mr. Talley's claim consistent with the terms of the Plan.

155.    Mr. Talley alleges all of the same conduct against Does 1 through 10 as he does against Defendant in this First Cause of Action and in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.    For all Plan benefits due and owing Plaintiff, including LTD benefits;

2.    For costs and reasonable attorneys' fees pursuant to 29 U.S.C. section 1132(g);

3.    For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred.  *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code section 10111.2; and

Case No.:



4.    For such other and further relief as this Court deems just and proper.

Dated:  August 26, 2024                    **McKENNON LAW GROUP PC**

By: _____
ROBERT J. McKENNON
ZLATINA T. MEIER
Attorneys for Plaintiff Edward Talley